## Ed Yelton v. The State.

No. 3246. Decided October 21, 1914.

### 1.—Aggravated Assault—Indictment—Simple Assault—Intent to Injure.

It is not necessary to allege in the indictment or information and complaint the intent to injure, and one charged with an aggravated assault may be convicted of a simple assault if the facts justify such finding. Following Davis v. State, 20 Texas Crim. App., 302.

### 2.—Same—Intent to Injure—Sufficiency of the Evidence.

Where upon trial of aggravated assault, the evidence showed that defendant called prosecuting witness to him, touched him on the shoulder and told him to go inside and apologize to defendant's wife, and prosecuting witness attempted to jerk away from him, when defendant took hold of his coat and pulled out his pocketknife which was already open, and the witness did as he was told, there was no error in the court's refusal of a special instruction to acquit the defendant if the evidence raised the issue that there was no intent to injure, as this issue was not raised by the evidence.

### 3.—Same—Assault and Battery—Definition—Statutes Construed.

Under article 1013, Penal Code, the use of any dangerous weapon or the semblance thereof in an angry or threatening manner with intent to alarm another and under circumstances calculated to effect that object comes within the meaning of an assault, and when the evidence showed that defendant's purpose in pulling an open knife was to alarm prosecuting witness to compel com-

pliance with his command, the question of accident or innocent intent is not involved. Following Bell v. State, 29 Texas, 492.

### 4.—Same—Charge of Court—Theory of Defense.

Where, upon trial of aggravated assault, the court not only submitted a proper charge, but also submitted a special instruction on defendant's theory of defense, there was no reversible error.

### 5.—Same—Jury and Jury Law—Bill of Exceptions.

Where, upon trial of aggravated assault, counsel for defendant desired to ask each juryman if he was a member of the Masonic Lodge, and if the fact that prosecuting witness was a member of the Masonic Lodge influenced him in arriving at a verdict, and only the questions, and not the answers thereto, are stated in the bill of exceptions, the same can not be reviewed on appeal.

### 6.—Same—Continuance—Want of Diligence.

Where the application for continuance showed a want of diligence and that the testimony contradicting the State's witness was testified to by defendant himself, there was no error in overruling the motion.

Appeal from the County Court of Donley. Tried below before the Hon. J. C. Killough.

Appeal from a conviction of simple assault; penalty, a fine of $5.

The opinion states the case.

*E. A. Simpson* and *King & Richey,* for appellant.—On question of simple assault: Ware v. State, 24 Texas Crim. App., 521; Sowther v. State, 18 id., 352; Johnson v. State, 43 Texas, 576; Lee v. State, 34 Texas Crim. Rep., 519; Decker v. State, 58 Texas Crim. Rep., 159, 124 S. W. Rep., 912.

On question of intent to injure: McGill v. State, 71 Texas Crim. Rep., 443, 160 S. W. Rep., 353; Perkins v. State, 62 Texas Crim. Rep., 508, 138 S. W. Rep., 133; Greer v. State, 106 S. W. Rep., 359.

On question of insufficiency of the indictment to convict for simple assault: Grayson v. State, 37 Texas, 228; West v. State, 10 id., 553; Hill v. State, 34 id., 624.

On question of continuance: Rushing v. State, 62 Texas Crim. Rep., 309, 137 S. W. Rep., 372.

*C. E. Lane,* Assistant Attorney General, and *W. T. Link,* County Attorney, for appellant.—On question of intent to injure: McKay v. State, 44 Texas, 43; Norton v. State, 14 id., 387; Hill v. State, 38 S. W. Rep., 987; Griffin v. State, 53 S. W. Rep., 848; Bristoe v. State, 51 S. W. Rep., 393.

On question of charge of court: Brent v. State, 57 Texas Crim. Rep., 411, 123 S. W. Rep., 593.

On question of sufficiency of indictment: Cromwell v. State, 60 Texas Crim. Rep., 183, 131 S. W. Rep., 595; Hartman v. State, 41 Texas, 562.

HARPER, JUDGE.—Appellant was indicted, charged with an aggra-

vated assault, the indictment reading: "On or about December 1, 1913, Ed Yelton did unlawfully with a pocketknife, the same being then and there a deadly weapon, commit an aggravated assault in and upon J. M. Clark."

Appellant contends that this indictment does not embrace a charge of simple assault, and the court erred in submitting that issue, and the verdict can not be sustained, because the indictment does not charge that the assault was made with "intent to injure." It is not necessary to allege in the indictment or information and complaint the intent to injure, and it has been held by this court that one charged with an aggravated assault may be convicted of a simple assault if the facts justify such finding. Davis v. State, 20 Texas Crim. App., 302.

The State's witness, J. M. Clark, testified: "My name is J. M. Clark. I live at Hedley, Texas, in Donley County. I lived there during the months of December and November, 1913. I know the defendant Ed Yelton and knew him during the year 1913. He also lived at Hedley, Donley County, Texas. I remember the occasion on which he assaulted me. It was some time during the month of December, 1913, I don't remember the exact date. On the morning on which he assaulted me I had come downtown early to go to work in my tailor shop on the west side of the main street of Hedley. I was up about the north end of the main street, standing in front of Moreman's store, talking to someone. I heard someone call 'Jim.' I looked up and saw Ed Yelton standing about ten feet in front of the porch of his barber shop, which was directly across the main street of Hedley and a little south of me. When I looked up the defendant, Ed Yelton, called to me and said, 'Jim, come here a minute, I want to talk to you.' I walked across the street to where he was, and when I got up close to him he reached up and tapped me on the shoulder and said, 'Jim, you have got to go in and apologize to my wife.' I pulled back from him and said, 'Ed, what does this mean?' He then grabbed me by the coat and jerked out an open knife and threw the knife with his right hand up in about ten inches of my throat and said, 'You come on in here and apologize to my wife or I'll cut your damned head off.' Of course I did not want my head cut off, so I went on in. As we walked across the street from where we stood into his shop he held me by the lapel of the coat with his left hand and held the knife up close to my throat with his right hand. The knife was open. I went into his house because I was scared of his knife and he had threatened to cut my head off and I did not want that done."

Appellant testified in his own behalf that the night before the alleged assault he had been informed by his wife that Clark had laughed and sneered at her; that he could not sleep and it preyed upon his mind. The next morning he looked out of his shop, saw Clark on the opposite side of the street, and in his own language he says: "I looked out of the front door and saw Clark standing on the sidewalk across the street, and I made up my mind I would go over and ask him to come in and apologize to my wife and stop his way of doing before it led to serious

trouble. I picked up an old dirty hat I had, put it on and stepped out of the front door and off the walk, and started over to where Clark was. Just as I stepped off of the walk I thought, 'now Clark is a bigger man than I am,' and I kinder turned my back to him, and pulled my pocket-knife out of my pocket and opened it and put it back in my pocket. My only purpose in opening the knife was to defend myself in case Clark attacked me when I asked him to come in and apologize to my wife. I called to Clark and he walked out into the street to meet me, and we met about middle ways of the street. My knife was in my pocket open, and I touched Clark on the shoulder with my hand and said, 'Jim, I will have to ask you to go in and apologize to my wife.' When I said this he jerked back from me and said, 'What does this mean?' When he did this I thought he was going to attack me, and I took hold of the lapel of his coat with my left hand and pulled my knife out of my pocket with my right hand and held it down by my side with my finger over the point of the blade and said to him, 'You come on.' . . . No, I never threw my knife up close to his throat and told him I would cut his damned head off if he didn't come on in and apologize, never got my knife where he could see it. I just held it down by my side in my hand with my finger over the blade. My only purpose in going out into the street and speaking to Mr. Clark was to request him to apologize to my wife and stop his insulting ways towards her so as to avoid trouble. I had absolutely no intentions of injuring Mr. Clark in any manner that morning unless he first attacked me. My only purpose in carrying my knife out there was to defend myself in case he attacked me when I asked him to apologize. I never tried to strike him or injure him in any way. I just touched him on the shoulder and told him that I would have to ask him to come in and apologize and when he pulled back I took hold of the lapel of his coat, pulled out my knife, and held it as I have already detailed and told him to come on."

On cross-examination he said he did not like Clark, but that he was only intending to use the knife if it was necessary.

Appellant cites authorities where it is held that if the evidence raises the issue that there was no intent to injure, that issue must be submitted to the jury, and he asked several special charges on that theory. We do not think the issue was raised by appellant's testimony, and to that we must look alone in passing on whether or not the issue was raised. His object and purpose, according to his testimony, was to demand that Clark apologize to his wife, and to see that he did it. No one can question under this testimony what the result would have been had Clark refused to apologize. When he says Clark jerked back and asked, "What does this mean," why did he pull out the knife he had already opened and catch Clark by the lapel of his coat? Under our former laws it was held that injury to the feelings alone, unaccompanied by violence, could not constitute an assault and battery, but that such injury was pertinent only as an aggravation of the legal injury. Spears v. State, 2 Texas Crim. App., 244; Jarnigan v. State, 6 Texas Crim. App., 465. But as said in Kief v. State, 10 Texas Crim. App., 286,

after these decisions were rendered, our Penal Code was amended and to article 489 (now 1013) these words were added: "But the use of any dangerous weapon or the semblance thereof in an angry or threatening manner with intent to alarm another and under circumstances calculated to effect that object, comes within the meaning of an assault." No one can question that appellant's purpose in pulling an open knife was to alarm Clark and compel compliance with his demand. There is nothing to suggest accident or innocent intent and the cases cited by appellant are in cases where such an issue is raised and appellant had no set, fixed purpose in his mind—to compel compliance with a demand—made as in this case—that Clark apologize to his wife. As said by our court in Bell v. State, 29 Texas, 492: "If A and B have words together, and, without any act on the part of B which signifies an intention to draw a weapon, or to do any harm to A, A should draw a weapon in an insulting manner and say to B, 'If you attempt to draw a weapon on me, I will kill you,' this would amount to an assault on the part of A, because the circumstances do not warrant any such violence. And so, a man may be guilty of an assault, even when he announces that he has no intention to do immediate injury.

"If A should meet B in the street, and should draw a weapon and say to him, 'I will shoot you if you do not make an apology to me; I will give you five minutes by my watch to make the apology'; this is clearly an assault, because it is 'in part execution of a purpose of violence' which it is the intention of A to carry into effect, unless B shall comply with a condition which he (A) chooses to impose."

What is the only reasonable and necessary deduction from the following testimony of appellant: "I just touched him on the shoulder and told him that I would have to ask him to come in and apologize, and when he pulled back *I took hold of the lapel of his coat, pulled out my knife* and told him to come on." If he had not "come on" at appellant's request or command, can anyone doubt what the result would have been? Can anyone question that it was the use of a dangerous weapon in a manner calculated to and with the intent to alarm Clark and force compliance with his request? We think not, and the court did not err in refusing the special charges of innocent intent, or the question of whether or not there was an intent to injure Clark. In a proper case where the evidence raises that issue, of course, that issue should be submitted to the jury, but in a case like this the evidence does not raise the issue, to the extent at least to require the court to present it affirmatively as a defense to his acts. The court, at the request of appellant, did instruct the jury:

"Gentlemen of the jury: At the request of the defendant, you are instructed as a part of the law herein, that if you find and believe from the evidence that the defendant's wife communicated to him as a fact that the said J. M. Clark had sneered at and insulted her by words or actions prior to the time on which the defendant is alleged to have assaulted the said J. M. Clark, and if you further find and believe that the defendant reasonably believed such communications and statements,

if any, from his wife, then you are instructed that the defendant had a right to go into the streets and request an apology from the said J. M. Clark to be made to his, the defendant's, wife, and you are further instructed that the defendant would have had this right, even though you may find and believe from the evidence that the statements and communications from the defendant's wife to him, if any such you find were made, were in fact not true, provided you find the defendant reasonably believed such statements, if any, of his wife, but in this connection you are further charged that the defendant would not be authorized to make an assault upon the said Clark."

This, in connection with the court's main charge, fully presented all the issues raised by the testimony.

Counsel desired to ask each juryman if he was a member of the Masonic Lodge, and if the fact that prosecuting witness was a member of the Masonic Lodge influenced them or either of them in arriving at their verdict. Only the questions are stated in the bill. It is not stated that either one of the jurymen would have answered he was a member of the Masonic Lodge, much less that if he was a member he would be influenced by the fact that the prosecuting witness was a Mason. Under such circumstances the bill is too incomplete to call for a review of the action of the court. This court under the allegations of the bill can not and does not know whether or not any member of the jury was a Mason.

Appellant filed an application for a continuance on account of the absence of D. B. Albright, who he says would testify that he had "good eyesight and that he did not see appellant have any knife, or make any assault on Clark." Inasmuch as appellant testifies that he did have a knife open and pulled it out of his pocket at the time he caught hold of the lapel of Clark's coat, it is evident the witness' eyesight is not so good, if he was in the position the application states. At any rate, as appellant himself testifies to facts that would contradict the witness, it presents no error.

The indictment in this case was returned January 14th; the term of court at which appellant was tried convened May 4th; no application for witness Self was made until May 2nd, and no reason stated why a subpoena was not sooner applied for. Under such circumstances the diligence was insufficient as to the witness J. J. Self, and the court did not err in overruling the application for a continuance.

The judgment is affirmed.

*Affirmed.*